## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## WORCESTER DIVISION

| | |
|---|---|
| JOSEPH W. REJ,<br><br>                  Plaintiff,<br><br>vs.<br><br>EQUIFAX INFORMATION SERVICES,<br>LLC, and EXPERIAN INFORMATION<br>SOLUTIONS, INC.<br><br>                  Defendants. | Civil Action No. 20-40015<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Joseph W. Rej ("Plaintiff" or "Mr. Rej"), a living, breathing, 69-year-old consumer, brings this Complaint against Equifax Information Services, LLC ("Equifax") and Experian Information Solutions, Inc. ("Experian") (collectively, "Defendants") and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

1

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendants acknowledge this potential for misuse and resulting damage every time they sell their credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

2

7.      The preservation of one's good name and reputation is also at the heart of the

FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all
> sorts of computerized data banks, the individual is in great danger of having his life
> and character reduced to impersonal "blips" and key-punch holes in a stolid and
> unthinking machine which can literally ruin his reputation without cause, and make
> him unemployable or uninsurable, as well as *deny him the opportunity to obtain a*
> *mortgage or buy a home. We are not nearly as much concerned over the possible*
> *mistaken turn-down of a consumer for a luxury item as we are over the possible*
> *destruction of his good name without his knowledge and without reason.* * * * *[A]s*
> *Shakespeare said, the loss of one's good name is beyond price and makes one poor*
> *indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570

(1970)].

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine

whether information disputed by consumers is inaccurate and record the current status of the

disputed information, or delete the disputed information, before the end of the 30-day period

beginning on the date on which the CRA receives the notice of dispute from the consumer. This

mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate

information contained within a consumer's credit report is corrected and/or deleted so as to not

prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.      In light of these important findings and purposes, Congress specifically noted "a

need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and

respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

10.     This action seeks actual, statutory, and punitive damages, costs and attorneys' fees

for Mr. Rej against Defendants for their willful and/or negligent violations of the Fair Credit

Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

3

**THE PARTIES**

11.     Plaintiff Joseph W. Rej ("Plaintiff" or "Mr. Rej") is a natural person who resides in the Town of South Grafton, State of Massachusetts, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

12.     Defendant Equifax Information Services, LLC. ("Equifax") is a foreign limited liability company authorized to do business in the State of Massachusetts.

13.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

14.     Defendant Experian Information Solutions, Inc. ("Experian") is a foreign limited liability company authorized to do business in the State of Pennsylvania.

15.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

### Defendants' Practices Concerning the Sale of Reports on the "Deceased"

18.     Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

19.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

20.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendants, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

21.     Defendants routinely place a "deceased" notation or marking on reports when they are advised by any of their many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

22.     Defendants' furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

23.     Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

24.     Defendants do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

25.     Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

26.     In some cases, in order to assure accuracy, Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their Experian and Equifax credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendants do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

27.     Defendants regularly receive the "Death Master File" from the Social Security Administration, listing by social security number those consumers that the government believes to be deceased. But Defendants do not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

28.     Defendants will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

29.     Defendants do not employ any procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

30.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants do not employ any procedures to assure that a consumer

with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

31.     Even in instances where the purportedly deceased consumer communicates directly with Defendants, Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

32.     Once a "deceased" mark is placed upon a consumer's report, Defendants will not calculate and will not provide a credit score for that consumer.

33.     Upon Defendants' reports with a "deceased" mark sold to third parties, Defendants never calculate or provide a credit score for that consumer and instead reports that consumer's credit score as "N/A."

34.     Defendants know that third party credit issuers require a credit score in order to process a given credit application.

35.     Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

36.     Defendants know that living consumers are routinely turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

37.     Defendants have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

38.     Defendants have received and documented many disputes from consumers complaining that their Experian and Equifax credit reports had them erroneously marked as "deceased."

39.     Defendants know that thousands of consumers are erroneously marked as "deceased" on their Experian and Equifax credit reports via an erroneous furnishing of the "X" code, even when said consumers are not on the Death Master File and are, in fact, alive.

40.     Nevertheless, Defendants do not employ any procedures to assure that a consumer marked as "deceased" on their Experian and Equifax credit reports is, in fact, deceased.

41.     Even consumers who dispute the erroneous "deceased" status on their Experian and Equifax credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

42.     Defendants do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

43.     Nor do Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

44.     For years after a consumer's actual death, Defendants will continue to sell credit reports about that consumer.

45.     Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

46.     Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

47.     Defendants profit from the sale of reports on deceased consumers.

48.     Defendants have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

49.     Defendants know that truly deceased consumers do not apply for credit.

50.     Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendants to be a common and major source of identity theft.

51.     Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

52.     Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

53.     Defendants have no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

54.     Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

55.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendants to sell their credit reports, absent a court order.

56.     Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Applies for a Capital One Credit Card in April 2019**

57.     On or about April 5, 2019, Plaintiff applied online for a Capital One credit card.

**Capital One Denies Plaintiff Credit Due to Defendants Experian and Equifax's Inaccurate Credit Reporting**

58.     In or about the first week of April 2019, shortly after submitting his credit application to Capital One, Plaintiff received mail correspondence from Capital One stating, among other things, that his credit application had been declined as a result of information obtained in consumer reports provided by Experian and Equifax, both of which indicated that he was "deceased."

59.     Immediately after receiving the above-referenced mail correspondence from Capital One, Plaintiff, extremely shocked, surprised, and embarrassed at Experian and Equifax's inaccurate reporting, requested copies of his credit reports from Experian, Equifax, and Trans Union.

**Plaintiff Receives His Experian Credit Report and Discovers that Defendant Experian is Reporting Him as Deceased**

60.      On or about May 14, 2019, Plaintiff received a copy of his Experian credit report in the mail.

61.     Upon review, Plaintiff discovered that Experian was reporting him as "deceased" on his Capital One credit card, Account Number ending in 6747.

**Plaintiff Disputes Experian's Inaccurate Reporting in May 2019**

62.     On or about May 14, 2019, Plaintiff placed a telephone call to Experian to dispute the "deceased" notation appearing on his credit report.

63.     Plaintiff spoke with an Experian representative and provided a detailed explanation of his issue, specifically stating that a Capital One tradeline on his Experian credit report was reporting as "deceased." Plaintiff stated this was inaccurate because he is alive and requested that Experian reinvestigate his dispute and send him a correct copy of his credit report as soon as possible.

**Experian Reinvestigates but Fails to Correct Plaintiff's Credit Report**

64.     On or about June 5, 2019, Plaintiff received mail correspondence from Experian containing a copy of his credit report.

65.     Upon review, Plaintiff discovered that Experian was still reporting him as "deceased" on his Capital One credit card, Account Number ending in 6747.

**Plaintiff Receives His Equifax Credit Report and Discovers that Defendant Equifax is Reporting Him as Deceased**

66.      On or about June 5, 2019, Plaintiff received a copy of his Equifax credit report in the mail.

67.     Upon review, Plaintiff discovered that like Experian, Equifax was reporting him as "deceased" on his Capital One credit card, Account Number ending in 6747.

**Plaintiff Disputes Equifax's Inaccurate Reporting in June 2019**

68.     On or about June 5, 2019, Plaintiff placed a telephone call to Equifax to dispute the "deceased" notation appearing on his credit report.

69.     Plaintiff spoke with an Equifax representative and provided a detailed explanation of his issue, specifically stating that a Capital One tradeline on his Equifax credit report was

reporting as "deceased." Plaintiff stated this was inaccurate because he is alive and requested that Equifax reinvestigate his dispute and send him a correct copy of his credit report as soon as possible.

### Plaintiff Applies for a WebBank/Fingerhut Advantage Revolving Credit Account in June 2019

70.    On or about June 8, 2019, Plaintiff applied online for a WebBank/Fingerhut Advantage Revolving Credit Account.

### WebBank/Fingerhut Denies Plaintiff Credit Due to Defendant Experian's Inaccurate Credit Reporting

71.    In or about the second week of June 2019, shortly after submitting his credit application to WebBank/Fingerhut, Plaintiff received mail correspondence from WebBank/Fingerhut stating, among other things, the following:

Thank you for applying for the WebBank/Fingerhut Advantage Revolving Credit Account and the WebBank/Fingerhut FreshStart Closed End Installment Loan.

After carefully reviewing your application, we are sorry to advise you that we cannot open an account for you at this time. If you placed an order for merchandise from Fingerhut with this application it has been cancelled.

Based on our internal information and information from Experian a consumer reporting agency, we believe that the Social Security number used for this application belongs to a deceased individual.

You can find out about the information contained in your file by contacting: Experian Consumer Assistance.

72.    Immediately after receiving the above-referenced mail correspondence from WebBank/Fingerhut, Plaintiff was frustrated, embarrassed, and humiliated by Experian's inaccurate reporting, and became anxious about his financial future.

**Plaintiff's Second Dispute to Defendant Experian in June 2019**

73.     On June 10, 2019, Plaintiff submitted a written dispute to Experian regarding the

"deceased" notation appearing on his credit report and stated, among other things, the following:

> In regards to my credit report: I applied for a credit card with Credit One Bank and
> was DENIED, because you have me listed as <u>DECEASED</u> on 1 or 1+ tradelines. I
> request you correct this matter <u>immediately</u>.
> I am sending copy of Drivers License and Electric Bill to prove I am not DEAD! I
> want this corrected and taken off my Credit Report <u>Immediately</u>. You have ruined
> my life because of your false public statements. The error is listed under Capital
> One card with a balance of 958 Card Account Number xxxxxxxxx6747.
>
> Enclosed is a copy of my Experian Credit Report that has an error listed.
>
> I want this removed or corrected.
>
> Under (Responsibility) you have <u>DECEASED</u>. This is wrong. I want this corrected
> and a new report sent to me with this correction made immediately.

**Equifax Reinvestigates but Fails to Correct Plaintiff's Credit Report**

74.     On or about June 10, 2019, Plaintiff received mail correspondence from Equifax

containing a copy of the results of his dispute.

75.     Upon review, Plaintiff discovered that Equifax was still reporting him as

"deceased" on his Capital One credit card, Account Number ending in 6747.

**Plaintiff's Second Dispute to Defendant Equifax in June 2019**

76.     In or about the second week of June 2019, Plaintiff placed a telephone call to

Equifax to dispute the "deceased" notation appearing on his credit report.

77.     Plaintiff spoke with an Equifax representative and provided a detailed explanation

of his issue, specifically stating that a Capital One tradeline on his Equifax credit report was

reporting as "deceased" and that Equifax had failed to correct the issue in response to his initial

dispute. Plaintiff stated this was inaccurate because he is alive and requested that Equifax

reinvestigate his dispute and send him a correct copy of his credit report as soon as possible.

78.     As a result of the "deceased" annotation, Defendants Experian and Equifax made it practically impossible for Plaintiff to obtain credit.

79.     At all times pertinent hereto, Defendants was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

80.     At all times pertinent hereto, the conduct of Defendants, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

**CLAIMS FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(Against Defendants Experian and Equifax)**

81.     Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-80 as if fully stated herein.

82.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

83.     On multiple occasions, Defendants prepared patently false consumer reports concerning Plaintiff.

84.     Despite actual and implied knowledge that Plaintiff is not dead, Defendants readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

85.     Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintains concerning Plaintiff.

86.     As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

87.     Defendants' conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

88.     Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Against Defendants Experian and Equifax)

89.     Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-80 as if fully stated herein.

90.     The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limitation for the completion of such an investigation. *Id.*

91.     The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate, or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

92.     On multiple occasions during 2019, Plaintiff initiated written and telephonic disputes with Defendants that they correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, references to him being "deceased."

93.     Either Defendants conducted *no* investigation of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

94.     Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

95.     As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

96.     Defendants' conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

97.     Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)     Determining that Defendants negligently and/or willfully violated the FCRA;

b)     Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)     Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

98.     Plaintiff demands a trial by jury.

Dated: February 10, 2020

/s/Elizabeth A. Miller
Elizabeth A. Miller
Attorney at Law
BBO #559347
99 High Street, Suite 304
Boston, MA 02110
(617) 478-4914
elizabethamiller@comcast.net


*Hans W. Lodge
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 607-7794
Fax: (612) 584-4470
Email: hlodge@bm.net
*(PRO HAC VICE FORTHCOMING)*

*ATTORNEYS FOR PLAINTIFF*